Filed 1/28/21  Murchison v. Murchison CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CARRIE MURCHISON, as Trustee, etc., | C084936 |
| Plaintiff and Appellant, | (Super. Ct. No. 34201500173955PRTRFRC) |
| v. | |
| OLA MURCHISON et al., | |
| Defendants and Respondents. | |

Carrie Murchison (Carrie), as Trustee for the Beulah Murchison Trust (Trust), appeals from a judgment denying her petition for declaratory relief against the State of California, Department of Health Care Services (Department).[1]  The petition seeks a determination that the Department may not recover costs from the Trust for Medi-Cal payments made on behalf of Carrie's late mother, Beulah Murchison (Beulah).  In the

---

[1]  For clarity, we will refer to members of the Murchison family by their first names.

alternative, the petition seeks a determination that Carrie is entitled to a hardship waiver pursuant to former section 14009.5, subdivision (c)(1) of the Welfare and Institutions Code.[2]  We conclude the trial court properly found the Department was entitled to reimbursement for Beulah's Medi-Cal expenses.  Accordingly, we shall affirm.

## I.  BACKGROUND

### A.  The Parties

Beulah died on February 20, 2013. She was survived by nine children, including Carrie and Ola Murchison (Ola).  Ola is not a party to this appeal.  Beulah was a Medicaid beneficiary, having received benefits under California's Medi-Cal program beginning in 2004 and ending upon her death at the age of 106.

### B.  The Trust

Beulah executed the Trust on March 9, 1994.  Beulah was the trustee and primary beneficiary, entitled to the full income and corpus of the trust during her lifetime. Beulah's children were named as remainder beneficiaries.  The Trust was funded with two properties purchased by Beulah and her husband in the 1940s, a residence and a café. Beulah transferred title to the residence and café to the Trust by quitclaim deed on March 9, 1994.  The Trust could be revoked in whole or in part at any time.

On April 2, 1996, Beulah wrote a letter to her children asking them to contribute towards the property taxes and insurance on the residence "to secure [their] rightful inheritance."

On April 10, 2002, Beulah executed an untitled document, later denominated "Declaration of Trust," changing the trustee from Beulah to three of her children and allowing the trustees "to start now managing and handling [her] affairs according to [her]

---

[2]  Undesignated statutory references are to the Welfare and Institutions Code.  References to former section 14009.5 are to the text of that statute as amended effective October 4, 1995.  (Stats. 1995, ch. 548, § 2, pp. 4248-4249.)

needs and desires." On May 28, 2002, Beulah executed a Declaration of Trust amending the Trust without relevant substantive changes.

On August 1, 2004, Beulah, Carrie, and Ola executed a document entitled "Agreement" (agreement) to settle litigation between them. As relevant here, the agreement provides that Carrie was to serve as the successor trustee to the Trust, which could not be amended or revoked by Beulah without a court order. On November 10, 2005, Beulah again amended the Trust without relevant substantive changes.

The Trust held title to the residence and café from March 9, 1994, until the time of Beulah's death nearly 20 years later. By then, the Trust had four beneficiaries: Carrie, Ola, and their siblings Paul and Mae (together, the beneficiaries).

C.      *Claim for Reimbursement and Application for Hardship Waiver*

The Department received notice of Beulah's death on or about May 25, 2013. The Department submitted a claim against Beulah's estate for reimbursement of medical expenses in the amount of $315,410 on July 18, 2013. The Department sent a letter giving notice of the claim to the estate the same day. The letter also gave notice, pursuant to former section 14009.5, subdivision (c)(1) and California Code of Regulations, title 22, section 50962, "of the opportunity to request a hardship waiver within 60 days." The letter enclosed a copy of a form entitled "Application for Hardship Waiver," and explained that an application "may be submitted by any heir who feels that enforcement of the Department's claim would cause a substantial hardship."

The application, in turn, states that: "Submission of this application is necessary to apply for a waiver of the claim due to substantial hardship." The application incorporates six criteria for consideration for a hardship waiver (which are codified in California Code of Regulations, title 22, section 50963 and set forth in footnote 9 *post*), and directs the applicant to "check the criteria . . . that qualifies the applicant for a hardship waiver." The application requires that the information provided in the form be certified under penalty of perjury.

Carrie failed to submit an application on behalf of herself or any other beneficiary within the original 60-day period, which ended on September 16, 2013. On March 19, 2014, the Department agreed to an additional 60 days in which to apply for a hardship waiver, until May 18, 2014. The Department sent Carrie another copy of the notice of claim and another copy of the required form.

On May 16, 2014, Carrie, through counsel, submitted a letter purporting to be a hardship application "for the beneficiaries of the Beulah Murchison Living Trust."[3] The letter was not on the form required by the Department. The letter acknowledged the requirement that an application for a hardship waiver "be submitted on a particular form," and further acknowledged that none of the criteria used to establish the existence of a substantial hardship was applicable. Nevertheless, the letter claimed that: "The Trust beneficiaries have substantially complied with the regulatory factors for a hardship waiver."[4]

The Department informed Carrie by telephone on May 22, 2014, that the letter was insufficient and could not be processed as an application. Carrie, through counsel, sent another copy of the letter, with additional documents, on May 29, 2014. The Department does not appear to have responded to Carrie's second letter.

---

[3] Again, the beneficiaries of the Trust at the time of Beulah's death were Carrie, Ola, Paul, and Mae.

[4] According to the letter, a hardship waiver was appropriate because: (1) the trust beneficiaries relied upon receiving shares of the residence and café as part of their retirement planning and invested time and money to maintain the properties consistent with that expectation; (2) the trust beneficiaries provided care and financial assistance to Beulah to delay her admission to a long-term care facility by more than two years; and (3) the trust beneficiaries needed equity from the residence and café to make necessary repairs.

In the meantime, Ola, acting independently, applied for his own hardship waiver by submitting a timely application on the required form. Ola's application was initially denied, and then granted following an estate hearing before the Department's Office of Administrative Hearings and Appeals. As a result, the Department waived Ola's proportionate share of the claim, reducing the claim amount to $236,558, with interest.

D. *The Petition*

Carrie commenced this action by filing the petition January 14, 2015. The petition asserts numerous causes of action against Ola and the Department. Carrie's causes of action against Ola are not presently before us. With respect to the Department, the petition seeks: (1) a declaration that Carrie, Paul, and Mae's interests in the Trust had vested by the time of Beulah's death; (2) an accounting of medical expenses paid on Beulah's behalf; (3) a declaration that Carrie is entitled to a hardship waiver; and (4) mandamus or injunctive relief prohibiting the Department from seeking reimbursement from the Trust.[5] These causes of action were bifurcated and tried as a bench trial in May and August 2016.

Sometime before trial, Carrie filed a request for judicial notice of two documents: (1) the State Medicaid Manual, which is published by the Centers for Medicare Services, United States Department of Health and Human Services, previously known as the Health Care Financing Administration (the Manual); and (2) an "Initial Statement of Reasons," published by the California Department of Health Care Services. The Department opposed the request, which was ultimately denied.[6]

After the close of evidence and submission of post-trial briefs, the trial court issued a statement of decision in the Department's favor. As relevant here, the trial court

---

[5] The petition alleges that the Trust became irrevocable by June 2006 due to Beulah's advancing dementia and resulting lack of capacity.

[6] Carrie does not appeal from the order denying the request for judicial notice.

5

found that: (1) Carrie failed to demonstrate that the Trust became irrevocable or the beneficiaries became vested prior to Beulah's death; (2) Carrie failed to properly submit a valid and timely application for hardship waiver; (3) Carrie failed to exhaust her administrative remedies with respect to any challenges to the hardship waiver criteria; (4) Carrie failed to exhaust her administrative remedies with respect to any claim that the Department failed to treat her letters as an application for a hardship waiver; and (5) neither former section 14009.5, subdivision (c)(1) nor California Code of Regulations, title 22, section 50963 are preempted or in conflict with federal law. Accordingly, the trial court denied the petition for declaratory relief against the Department and entered judgment in the Department's favor.

This appeal timely followed.

## II. DISCUSSION

On appeal, Carrie argues: (1) California's estate recovery laws (specifically, former section 14009.5, subdivision (c)(1)) and related regulations (specifically, California Code of Regulations, title 22, section 50963) are preempted by federal Medicaid statutes and regulations (specifically, Title 42 United States Code section 1396p(b)(3); hereafter 42 U.S.C. section 1396p(b)(3)); (2) Carrie substantially complied with the requirements for obtaining a hardship waiver and exhausted her administrative remedies with respect to the denial of her "application"; (3) the Department's failure to respond in writing to Carrie's letters amounts to a denial of due process; and (4) the Department is equitably estopped from seeking reimbursement from the Trust.[7] We address these contentions in order.

---

[7] Carrie also argues for the first time on appeal that California Code of Regulations, title 22, section 50963, subdivision (a)(4) (also known as the "caretaker exemption") violates her right to equal protection. "In civil cases, constitutional questions not raised in the trial court are considered waived." (*In re Marriage of S.* (1985) 171 Cal.App.3d 738, 745; accord *Neil S. v. Mary L.* (2011) 199 Cal.App.4th 240, 254 [" ' "Typically,

6

*A.* *Preemption*

Carrie acknowledges she does not satisfy any of the specific criteria for determining whether a "substantial hardship" exists under former section 14009.5, subdivision (c)(1) and California Code of Regulations, title 22, section 50963. She argues, however, that former section 14009.5, subdivision (c)(1) and California Code of Regulations, title 22, section 50963 are preempted by 42 U.S.C. section 1396p(b)(3), which directs states to waive estate recovery requirements upon a showing of "undue hardship." Because our preemption analysis requires an understanding of the relationship between the federal Medicaid and state Medi-Cal programs, we begin with an overview of the applicable statutory schemes.

*1.* *Medicaid and Medi-Cal*

The federal Medicaid program provides joint federal and state funding of medical care for individuals who cannot afford to pay their own medical costs. (*Arkansas Dept. of Health and Human Servs. v. Ahlborn* (2006) 547 U.S. 268, 275 (*Ahlborn*); 42 U.S.C. § 1396a et seq. (the Medicaid Act).) "States are not required to participate in Medicaid, but all of them do." (*Ahlborn, supra,* at p. 275.) California participates in the federal Medicaid program through the California Medical Assistance Program (Medi-Cal) (§ 14000 et seq.). (*Olszewski v. Scripps* (2003) 30 Cal.4th 798, 804 (*Olszewski*).)

Congress designed the Medicaid program to ensure that states dispense federal funds in compliance with federal rules. The Medicaid program "offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions." (*Armstrong v. Exceptional Child Ctr.* (2015) 575 U.S. 320, 323 (*Armstrong*).) As a participant in the

---

constitutional issues not raised in earlier civil proceedings are waived on appeal" ' "].) We discern no basis for departing from this general rule in the circumstances of this case, and therefore decline to consider Carrie's equal protection challenge to the caretaker exemption.

Medicaid program, "the State of California has agreed to abide by certain requirements imposed by federal law." (*Olszewski, supra,* 30 Cal.4th at p. 804.)

The Medicaid Act charges the federal government with crafting baseline eligibility requirements for recipients and providers, determining covered medical services, and establishing reimbursement standards for the states. (See 42 U.S.C. § 1396 et seq; *National Federation of Independent Business v. Sebelius* (2012) 567 U.S. 519, 541-542.) Cooperating states then implement the program, agreeing to abide by federal conditions in return for federal matching funds used for expenses such as provider reimbursements. (*Armstrong, supra,* 575 U.S. at p. 323.) State departures from federal requirements provide grounds for the Secretary of Health and Human Services (Secretary) to withhold Medicaid funding, either in whole or in part. (See 42 U.S.C. § 1396c.) Even so, the Medicaid program " 'was designed to provide the states with a degree of flexibility in designing plans that meet their individual needs. [Citation.] As such, states are given considerable latitude in formulating the terms of their own medical assistance plans.' " (*Olszewski, supra,* 30 Cal.4th at p. 810.) We are concerned here with the estate recovery provisions of federal and state law, which are found in section 1396p of the Medicaid Act and former section 14009.5 of the Medi-Cal Act.

2. *Estate Recovery Provisions*

"Persons qualify for Medicaid benefits if they are aged, blind, disabled or the parent of a minor child, and their income and resources are insufficient to meet the costs of necessary care and services for the child, as measured by specified statutory criteria. [Citations.] However, because an applicant's principal residence is excluded as a countable resource in determining eligibility [citation], some persons who possess valuable assets are allowed to receive benefits. Congress justified this incongruity by authorizing "estate recovery," that is, the recovery of all or a portion of the benefits paid from the estate of such a beneficiary after his or her death." (*California Advocates for*

8

*Nursing Home Reform v. Bonta* (2003) 106 Cal.App.4th 498, 508, fn. omitted (*California Advocates*).)

"Prior to 1993, states were permitted, but not required, to establish estate recovery programs." (*California Advocates, supra,* 106 Cal.App.4th at p. 508.) Faced with rising healthcare costs, however, Congress amended the Medicaid Act in 1993 to require states to recover costs from the estates of certain deceased Medicaid recipients. (*Id.* at p. 509; see Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66 (Aug. 10, 1993) § 13612, 107 Stat. 312, 627-628 (codified at 42 U.S.C. § 1396p(b)(1).) Federal law now requires that "each state . . . include in its state plan a provision for making recoveries from the estates of specified classes of Medicaid recipients." (*California Advocates, supra,* at p. 509; see 42 U.S.C. § 1396p(b)(1).) States that fail to do so risk losing all or part of their Medicaid funding. (*California Advocates, supra,* at p. 509; see 42 U.S.C. § 1396c.)

California implements the estate recovery requirement through former section 14009.5, which provides, with limited exceptions, that the Department "shall claim against the estate of the decedent, or against any recipient of the property of that decedent by distribution or survival[,] an amount equal to the payments for the health care services received or the value of the property received by any recipient from the decedent by distribution or survival, whichever is less." (Former § 14009.5, subd. (a).)

While federal and state law require estate recoveries in some circumstances, they prohibit them in others. Estate recovery claims are not permitted before the death of a surviving spouse (or domestic partner in California), or when the decedent has a surviving child under the age of 21, or when the decedent has a surviving child who is blind or disabled as defined by statute. (42 U.S.C. § 1396p(b)(2); former § 14009.5, subd. (b).) Estate recovery claims are also subject to several exemptions, or waivers by the Department, including the one relevant to this appeal, the hardship waiver.

*3.     Hardship Waivers*

The Medicaid statute directs states to establish procedures and standards for waiving estate recoveries upon a showing of "undue hardship." (42 U.S.C. § 1396p(b)(3).) To this end, 42 U.S.C. section 1396p(b)(3)(A) provides: "The State agency shall establish procedures (in accordance with standards specified by the Secretary) under which the agency shall waive the application of this subsection [except in circumstances not relevant here] if such application would work an *undue hardship* as determined on the basis of criteria established by the Secretary." (Emphasis added.)

The Medicaid statute does not define the phrase "undue hardship." However, a House Budget Committee Report prepared in connection with the Omnibus Budget Reconciliation Act commented upon the term, stating that, in establishing criteria for "undue hardship," the Secretary "should provide for special consideration of cases in which the estate subject to recovery is (1) the sole income-producing asset of survivors (where such income is limited), such as a family farm or other family business, or (2) a homestead of modest value or (3) other compelling circumstances." (H.R. Rep. No. 103-111, 1st Sess., p. 209 (1993), as reprinted in 1993 U.S.C.C.A.N. 378, 536.)

The Centers for Medicare Services has promulgated guidance concerning hardship waivers in the Manual.[8] (*West Virginia v. Thompson* (4th Cir. 2007) 475 F.3d 204, 208.) The Manual directs states to "[e]stablish procedures and standards for waiving estate recoveries when they would cause undue hardship." (Health Care Fin. Admin., U.S. Dep't of Health & Human Servs., State Medicaid Manual 75 § 3810(C) (2001) (Manual).) The Manual states: "You have flexibility in implementing an undue hardship

---

[8] As noted, Carrie has not appealed from the trial court's denial of her request for judicial notice of the Manual and Initial Statement of Reasons. We take judicial notice of the Manual on our own motion. We decline to take judicial notice of the Initial Statement of Reasons and disregard Carrie's arguments purportedly supported by that document.

10

provision." (*Ibid.*)  The Manual refers to the legislative history of the Omnibus Budget Reconciliation Act for guidance on the meaning of the phrase "undue hardship," restating the examples set forth above.  (*Ibid.*)  The Manual continues:  "[The Health Care Financing Administration] suggests that you consider the examples listed above in developing your hardship waiver rules, but does not require you to incorporate these examples once you have considered whether they are appropriate for determining the existence of an undue hardship."  (*Id.,* at (C)(1).)  The Manual concludes:  "In considering your criteria, you may conclude that an undue hardship does not exist if the individual created the hardship by resorting to estate planning methods under which the individual illegally divested assets in order to avoid estate recovery."  (*Ibid.*)

California's implementation of the hardship waiver is found in former section 14009.5, subdivision (c)(1), which provides:  "The department shall waive its claim, in whole or in part, if it determines that enforcement of the claim would result in substantial hardship to other dependents, heirs, or survivors of the individual against whose estate the claim exists."  The California statute does not define the term "substantial hardship." However, California Code of Regulations, title 22, section 50963 identifies six criteria for determining whether a substantial hardship exists.  These criteria are set forth in full in the footnote below.[9]

---

[9] California Code of Regulations, title 22, section 50963, entitled "Substantial Hardship Criteria," provides as follows:

" (a)   The Department shall waive an applicant's proportionate share of the claim if the applicant can demonstrate through submission of an Application for Hardship Waiver, form DHCS 6195 (05/15) and documentation to substantiate hardship, or, if applicable, at an estate hearing, that enforcement of the Department's claim would result in substantial hardship to the applicant.  In determining the existence of substantial hardship, the Department shall waive an applicant's proportionate share of the claim if one or more of the following criteria apply:

Carrie argues California law authorizing hardship waivers upon a showing of "substantial hardship" and limiting the circumstances comprising such "substantial hardship" to six specific criteria conflicts with federal law requiring hardship waivers upon a showing of "undue hardship," and stands as an obstacle to a supposed Congressional objective of making relief from estate recovery laws available where equitable considerations or "other compelling considerations" demand it. As we shall discuss, Carrie fails to meet her burden of establishing preemption.

---

"(1)   When allowing the applicant to receive the inheritance from the estate would enable the applicant to discontinue eligibility for public assistance payments and/or medical assistance programs; or,

"(2)   When the estate property is part of an income-producing business, including a working farm or ranch, and recovery of medical assistance expenditures would result in the applicant losing his or her primary source of income; or,

"(3)   When an aged, blind, or disabled applicant has continuously lived in the decedent's home for at least one year prior to the decedent's death and continues to reside there, and is unable to obtain financing to repay the State. The applicant shall apply to obtain financing, for an amount not to exceed his or her proportionate share of the claim, from a financial institution as defined in Probate Code Section 40. The applicant shall provide the Department with a denial letter(s) from the financial institution; or,

"(4)   When the applicant provided care to the decedent for two or more years that prevented or delayed the decedent's admission to a medical or long-term care institution. The applicant must have resided in the decedent's home during the period care was provided and continue to reside in the decedent's home. The applicant must provide written medical substantiation from a licensed health care provider(s), which clearly indicates that the level and duration of care provided prevented or delayed the decedent from being placed in a medical or long-term care institution; or,

"(5)   When the applicant transferred the property to the decedent for no consideration; or,

"(6)   When equity in the real property is needed by the applicant to make the property habitable, or to acquire the necessities of life, such as food, clothing, shelter or medical care."

12

### 4. *Preemption Principles and Standard of Review*

" ' "The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law." [Citations.] Similarly, federal agencies, acting pursuant to authorization from Congress, can issue regulations that override state requirements. [Citations.] Preemption is foremost a question of congressional intent: did Congress, expressly or implicitly, seek to displace state law?' " (*Solus Industrial Innovations, LLC v. Superior Court* (2018) 4 Cal.5th 316, 331 (*Solus Industrial*).)

Our Supreme Court has instructed that the search for congressional intent should be conducted " 'through the lens of a presumption against preemption. [Citations.] The presumption is founded on "respect for the States as 'independent sovereigns in our federal system' "; that respect requires courts "to assume that 'Congress does not cavalierly pre-empt state-law causes of action.' " [Citation.] The strength of the presumption is heightened in areas where the subject matter has been the long-standing subject of state regulation in the first instance; where federal law touches "a field that ' "has been traditionally occupied by the States," ' ' " the party seeking to show preemption "bear[s] the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.' " ' [Citations.] The presumption applies to the scope as well as the existence of preemption." (*Solus Industrial, supra,* 4 Cal.5th at p. 332.)

Importantly, "the very nature of the Medicaid program triggers a presumption against preemption. The Medicaid program is 'based on a scheme of cooperative federalism.' [Citation.] Under this scheme, a participating state creates and administers its own plan which must be approved by the Secretary. [Citation.] Thus, the participating state works in tandem with the federal government in pursuit of a common purpose—the provision of medical care to the needy. 'Where[, as here,] coordinate[d] state and federal efforts exist with a complementary administrative framework, and in

13

pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.' " (*Olszewski, supra,* 30 Cal.4th at p. 816.)

Our Supreme Court has identified " 'several species of preemption. Congress may expressly preempt state law through an explicit preemption clause, or courts may imply preemption under the field, conflict, or obstacle preemption doctrines.' " (*Solus Industrial, supra,* 4 Cal.5th at p. 332.) We are concerned here with obstacle preemption, which arises " 'when state law "stands as an *obstacle* to the accomplishment and execution of the full purposes and objectives of Congress." ' " (*Ibid.*) Obstacle preemption "requires proof Congress had particular purposes and objectives in mind, a demonstration that leaving state law in place would compromise those objectives, and reason to discount the possibility the Congress that enacted the legislation was aware of the background tapestry of state law and content to let that law remain as it was. Ultimately, 'what constitutes a "sufficient obstacle [for a finding of implied preemption] is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." ' " (*Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 312.)[10]

We review questions of statutory interpretation and preemption de novo, following traditional principles of statutory interpretation (*Coyne v. City and County of San Francisco* (2017) 9 Cal.App.5th 1215, 1224 [preemption]; *Hardesty v. Sacramento Metropolitan Air Quality Management Dist.* (2011) 202 Cal.App.4th 404, 420 [statutory

---

[10] Carrie argues that former section 14009.5 and California Code of Regulations, title 22, section 50963 conflict with 42 U.S.C. section 1396p(b)(3), in that the state law authorizes hardship waivers upon a showing of "substantial hardship," while the federal law contemplates hardship waivers upon a showing of "undue hardship." However, Carrie does not argue that conflict preemption should be found, and thus we have no occasion to consider that question. (*People v. ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 778 ["Conflict preemption is found when it is impossible to comply with both state and federal law simultaneously"].)

14

construction]), which require us "to ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386.)

     5.    *Analysis*

Carrie argues that former section 14009.5 and California Code of Regulations, title 22, section 50963, which require a showing of "substantial hardship," stand as an obstacle to federal Congressional intent, which contemplates that states will establish procedures for hardship waivers upon a showing of "undue hardship." (42 U.S.C. § 1396p(b)(3).) Carrie makes much of what she perceives to be a material difference between the "undue hardship" prescribed by federal law and the "substantial hardship" codified in California law. According to Carrie, an "undue hardship" is one that may appear upon consideration of a wide range of equitable factors, while a "substantial hardship" is one that follows from the mechanical application of a checklist of narrowly drawn criteria. Although she does not explicitly say so, Carrie appears to view California's "substantial hardship" standard as more rigorous and difficult to satisfy than the "undue hardship" standard contemplated by federal law, and thus, as an obstacle to accomplishing the Congressional purpose of making hardship waivers available upon a showing of "undue hardship." We are not persuaded.

It is true, as Carrie observes, that 42 U.S.C. section 1396p(b)(3) directs states to establish procedures for waiving estate recovery laws upon a showing of "undue hardship" and former section 14009.5, subdivision (c)(1) and California Code of Regulations, title 22, section 50963 speak in terms of a showing of "substantial hardship." It is also true, of course, that the modifiers "undue" and "substantial" are different words, with differing meanings. (See Merriam-Webster Collegiate Online Dict. <https://unabridged.merriam-webster.com/collegiate/> [as of Jan. 15, 2021], archived at <https://perma.cc/8SR8-PLVE> [defining "undue," in part, as "exceeding or violating propriety or fitness: EXCESSIVE"] and *ibid.* [defining "substantial," in part, as

15

"not imaginary or illusory:  REAL, TRUE" and "considerable in quantity: significantly great"].)  But these differences do not, by themselves, establish obstacle preemption.

"As a majority of the current United States Supreme Court has agreed at one time or another 'pre-emption analysis is not "[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," [citation], but an inquiry into whether the ordinary meanings of state and federal law conflict.' " (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal4.th 929, 939-940; see also *Silkwood v. Kerr-McGee Corp.* (1984) 464 U.S. 238, 256 [Mere "tension" between federal and state law does not suffice to show an obstacle supporting preemption where the state law does not actually "frustrate the objectives of the federal law"].)  We perceive no irreconcilable conflict between state and federal law in this case, or frustration of congressional purpose in California's substantial hardship standard.

As previously discussed, the Medicaid statute directs states to establish procedures for waiving estate recovery requirements in cases of "undue hardship."  (42 U.S.C. § 1396p(b)(3).)  Neither the Medicaid statute nor the Manual defines the term "undue hardship."  Instead, the Manual makes clear that states "have flexibility in implementing an undue hardship provision."  (Manual § 3810(C).)  Our Legislature, in exercising that federally authorized flexibility, could reasonably conclude that an "undue hardship," for purposes of waiving the estate recovery requirements, means one that is "substantial." California's use of the word "substantial," in place of "undue," does not raise an irreconcilable conflict or stand as an obstacle to the congressional objective of making hardship waivers available in appropriate cases.

*Dalzin v. Belshe* (N.D. Cal. 1997) 993 F.Supp. 732 (*Dalzin*), on which Carrie relies, does not compel a contrary conclusion.  There, the federal district court considered California's "proportionate share" program for recovering costs from those portions of estates devised to surviving children of Medi-Cal beneficiaries who are not under 21, blind, or disabled.  (*Id.* at p. 733.)  The court found the "proportionate share" program

16

was preempted by the federal Medicaid Act, which provided that the state could only seek recovery from the decedent's estate " 'at a time when he has no surviving child who is under age 21, . . . blind or disabled.' " (*Id.* at p. 734.)  The court explained:  "If Congress had wanted states to have the option to establish a 'proportionate share' system, it could have easily done so.  For example, if the law simply provided that 'states cannot maintain claims for recovery against the portion of the estate devised to the decedent's surviving spouse or surviving minor, blind or disabled children,' a 'proportionate share' system may be permissible.  But this is not what the law says.  The court simply cannot rule that Congress did not mean for the law to read as written, but instead intended an alternate meaning that Congress could have easily expressed in other terms."  (*Ibid.*)

This case is not like *Dalzin*, in which California's "proportionate share" program was directly contrary to the federal Medicaid Act and posed an obstacle to the accomplishment of Congress's intent to exclude the estates of certain decedents from the operation of the estate recovery laws.  Here, by contrast, Congress declined to define the phrase "undue hardship," leaving that task to the Secretary.  (42 U.S.C. § 1396p(b)(3).)  The Secretary, in turn, delegated responsibility for developing standards and procedures for hardship waivers to the Centers for Medicare Services, which encouraged states to develop their own hardship waiver rules.  (Manual § 3810.)  We cannot say that California's exercise of this delegated authority stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, particularly when " 'state and federal efforts exist within a complementary administrative framework' " (*Olszewski, supra,* 30 Cal.4th at p. 816), and the Secretary has approved the result.  (See *West Virginia v. Thompson, supra,* 475 F.3d at p. 208 ["The Secretary has the responsibility of determining whether proposed state plans and plan amendments meet federal Medicaid requirements.  Congress has directed that the Secretary 'shall approve' any plan or amendment that complies with federal law"]; and see *Solus Industrial, supra,* 4 Cal.5th at p. 345 [claims based on alleged violations of California

17

workplace safety standards did not stand as an obstacle to achieving purposes of Federal Occupational Safety and Health Act of 1970 where federal law encouraged states to assume responsibility for administration and enforcement of workplace safety and Secretary of Labor approved California standards].)

Carrie takes issue with California's criteria for determining whether a substantial hardship exists, which is set forth in California Code of Regulations, title 22, section 50963. She directs our attention to the Manual, which encourages states to consider enumerated examples of "undue hardships," as well as "other compelling circumstances." (Manual § 3810(C).) According to Carrie, 42 U.S.C. section 1396p(b)(3)'s use of the word "undue," in combination with the Manual's reference to "other compelling circumstances," show that Congress and the Centers for Medicare Services intended for states to consider a range of equitable factors in deciding whether to grant applications for hardship waivers. We are not persuaded.

We are not inclined to agree with Carrie's interpretation of the Manual. As noted, the Manual encourages states to consider "cases in which the estate subject to recovery is: (1) the sole income-producing asset of survivors (where such income is limited), such as a family farm or other family business; (2) a homestead of modest value; or (3) other compelling circumstances." (Manual § 3810(C)(1).) The placement of "other compelling circumstances" on a list with specifically enumerated "examples" of circumstances constituting "undue hardships" leads us to believe that the Centers for Medicare Services intended that states identify other specific examples of circumstances that might be sufficiently "compelling" to warrant an exemption from the estate recovery laws. Further, the Manual's use of the phrase "*other* compelling circumstances," which implies an identification of circumstances of a piece with the specifically enumerated ones (i.e., where the decedent's estate is "the sole income-producing asset of survivors" or "a homestead of modest value"), rather than "*any* compelling circumstances," which would suggest an unlimited examination of the equities of the kind that Carrie proposes.

18

We need not resolve this issue, however, as the Manual makes clear that states need not incorporate any of the foregoing "examples" into their hardship criteria. (*Ibid*.) Thus, states need not include "other compelling circumstances" in their hardship criteria, whatever they may entail.

That states have flexibility in deciding whether to include "other compelling circumstances" in their hardship criteria, which tells us that California is not required to authorize a hardship waiver upon a showing of any circumstance that may be deemed "compelling." Rather, the Manual confirms that California may develop its own criteria for evaluating qualifying hardships. (Manual § 3810(C)(1).) It follows that "other compelling circumstances" are not inherent in the term "undue hardship." That being so, we perceive no basis for concluding that California was required by federal law to include general equitable considerations in its criteria for hardship waivers. Nor do we perceive any basis for concluding that California's hardship criteria stand as an obstacle to the accomplishment of any congressional purpose or objectives underlying 42 U.S.C. section 1396p(b)(3). As we have discussed, the Medicaid Act and Manual contemplate that states will develop their own hardship criteria, leaving California free to define "undue hardship" as a "substantial hardship" that may be ascertained through the application of an objective checklist. Carrie fails to show that California's interpretation and implementation of the Medicaid Act or Manual frustrates any congressional purpose or objective, and accordingly, fails to demonstrate obstacle preemption.

We therefore reject Carrie's contention that 42 U.S.C. section 1396p(b)(3) preempts former section 14009.5 and California Code of Regulations, title 22, section 50963. Having done so, we likewise reject Carrie's contention, also based on her preemption theory, that her application for a hardship waiver should be evaluated for "compelling circumstances" pursuant to her interpretation of federal law.

19

## B. Exhaustion of Administrative Remedies

As previously discussed, California Code of Regulations, title 22, section 50963 establishes six criteria for determining whether a "substantial hardship" exists for purposes of waiving the estate recovery law. Carrie does not pretend to satisfy any of these criteria. Instead, she argues, as she did in the trial court, that she "substantially complied" with the requirements for obtaining a hardship waiver. The trial court rejected Carrie's substantial compliance argument, finding that it was barred by her failure to exhaust administrative remedies. We agree with the trial court.

"As a general rule where 'an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act; . . .' [Citation.] When the issue is properly pursued, jurisdiction of the court to entertain an action for judicial relief is conditional upon a completion of the administrative procedure. [Citation.] The rule applies as well when the administrative procedure is provided by regulation, resolution or ordinance. [Citations.] The rationale for the rule has been explained as follows: 'The administrative claim or "cause of action" is within the special jurisdiction of the administrative agency, and the courts may act only to review the final administrative determination. Allowing a suit prior to such a final determination would constitute interference with the subject matter jurisdiction of another tribunal. Accordingly, the exhaustion of an administrative remedy is a jurisdictional element in California.' " (*Green v. City of Oceanside* (1987) 194 Cal.App.3d 212, 219-220.) Nothing in the record suggests that Carrie has complied with the administrative procedure for challenging the hardship criteria or pursuing her theory that she substantially complied with those criteria.

California Code of Regulations, title 22, section 50962, subdivision (e) provides that an applicant has 60 days from the date stated on the Department's notice of claim in which to submit an application for a hardship waiver. If an application for a hardship waiver is denied, California Code of Regulations title 22, section 50963, subdivision (g)

requires the Department to notify the applicant of his or her right to request an estate hearing. The estate hearing must be conducted in an impartial manner by a hearing officer appointed by the Director of the Department. (Cal. Code Regs., tit. 22, § 50964, subds. (a) and (b).) Following the estate hearing, the hearing officer issues a proposed decision, which is reviewed by the Director of the Department, who renders the final administrative decision. (Cal. Code Regs., tit. 22, § 50964, subd. (c).) That decision is subject to judicial review by way of a petition for writ of administrative mandate pursuant to Code of Civil Procedure, section 1094.5. (Cal. Code Regs., tit. 22, § 50964, subd. (f).)

Carrie appears to argue that she was unable to pursue an administrative remedy because doing so would have entailed the submission of the form, which she could not truthfully complete. Because she could not check any of the boxes indicating applicable hardships, Carrie suggests, she could not submit a completed application on the required form. And because the Department refused to process her correspondence as an "application" in lieu of the form, Carrie continues, she never received a notice that her request for a hardship waiver had been "denied," and therefore, could not request an estate hearing. Thus, Carrie suggests that the requirement that she submit the form consigned her to an administrative limbo, which made exhaustion of administrative remedies impossible. We are not persuaded.

Carrie's argument rests on a false choice between submitting a perjurious application on the required form, on the one hand, and pursuing an administrative remedy, on the other. Nothing prevented Carrie from submitting an application that truthfully acknowledged her inability to satisfy the hardship criteria (by leaving the relevant boxes unchecked), and then exhausting her administrative remedies with respect to the probable denial of the application. On the record before us, we perceive no reason why Carrie's challenge to the hardship criteria and theory of substantial compliance could not have been presented to a hearing officer in the first instance. Thus, we agree with the

21

trial court that Carrie failed to exhaust her administrative remedies with respect to these claims. We therefore lack jurisdiction to consider them.

## C. *Due Process*

Carrie argues the Department's failure to respond to her purported "application" in writing amounted to a violation of her right to due process. Carrie's argument presupposes that her counsel's correspondence with the Department constituted an "application" within the meaning of California Code of Regulations, title 22, section 50963, subdivision (a) that would trigger the Department's duty to respond pursuant to subdivision (e) of the same regulation. But the trial court specifically rejected this theory, finding that it, too, was barred by Carrie's failure to exhaust administrative remedies.[11] Carrie makes no effort to address the trial court's conclusion or explain why it was erroneous. Accordingly, we reject Carrie's due process claim.

## D. *Equitable Estoppel*

Finally, Carrie argues the Department should be equitably estopped from seeking reimbursement for Beulah's medical expenses from the Trust. Specifically, she argues the Department should be equitably estopped from seeking reimbursement by reason of the letter Beulah wrote to her children in 1996 and the agreement. According to Carrie,

---

[11] The trial court reasoned: "To the extent that Carrie argues she was denied due process because [the Department] did not process her correspondence as an application, this argument is unavailing. Carrie was aware that her correspondence did not qualify as an application. She acknowledged as such in her correspondence to [the Department] dated May 16, 2014, and then resent via correspondence dated May 29, 2014. Additionally, the requirement that an application be submitted on the designated form was very clear, and Carrie was informed via telephone that [the Department] was not processing her correspondence as an application. If Carrie felt that this was in error, the proper method for challenging [the Department's] decision not to issue a written decision regarding her purported application was through a writ of traditional mandamus under Code of Civil Procedure section 1085. [Citations.]" We have no occasion to consider the trial court's analysis, for the reasons stated in the text.

22

the beneficiaries reasonably relied on the letter and agreement, provided labor and money to maintain the residence and café, and thereby acquired interests in the properties, which the Department should be equitably estopped from disturbing.[12] We cannot agree.

"The elements of equitable estoppel are '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.) "An additional requirement applies in cases involving equitable estoppel against the government. In such a case, the court must weigh the policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest. [Citations.] Even if the four elements of equitable estoppel are satisfied, the doctrine is inapplicable if the court determines that the avoidance of injustice in the particular case does not justify the adverse impact on public policy or the public interest." (*Ibid.*)

We agree with the trial court that Carrie's argument for equitable estoppel falls short. As the trial court observed, Carrie's argument is predicated on outside writings (the agreement and the letter Beulah wrote to her children), neither of which can be said to have acted as a formal amendment to the Trust. Nothing in the record suggests the Department was a party to any agreement between Beulah and the beneficiaries, or even aware of the agreement or letter. Thus, Carrie's argument for equitable estoppel fails,

---

[12] Carrie's argument is a variation on themes she pursued in the trial court; namely, that the Trust had become irrevocable by the time of Beulah's death by reason of the agreement, and the beneficiaries' interests in the Trust became vested by reason of their performance of the "offer" set forth in the letter Beulah wrote to her children in 1996. Carrie renews these arguments in her reply brief, but does not assert them in her opening brief. We do not consider arguments raised for the first time in a reply brief. (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.)

and we need not concern ourselves with the other elements of the doctrine or public policy considerations.[13]

### III.  DISPOSITION

The judgment is affirmed.  The Department shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/S/

RENNER, J.

We concur:

/S/

HULL, Acting P. J.

/S/

MAURO, J.

[13] Carrie argues for the first time in her reply brief that the statute of limitations precludes the Department's claim for reimbursement.  Again, we do not consider arguments raised for the first time in a reply brief.  (*Varjabedian v. City of Madera, supra,* 20 Cal.3d at p. 295, fn. 11.)